**SCOOLIDGE, PETERS, RUSSOTTI & FOX, LLP**
Peter Fox (PF7117)
pfox@sprfllp.com
2 Park Avenue
20th Floor
New York, NY 10016
Tel: (212) 729 7708

*Additional Plaintiffs' Counsel Listed on Signature Page*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**BROOKLYN DIVISION**

|  |  |
|---|---|
| **ADELINA PEPENELLA** and **ALAN FERNANDEZ** individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **DOMAINE BOUSQUET S.A.**, an Argentine corporation, and **WISD LLC**, a Delaware limited liability company d/b/a Origins Organic Imports, <br><br> Defendants. | **CLASS ACTION** <br><br> **COMPLAINT** <br><br> Case No. |

**CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiffs Adelina Pepenella and Alan Fernandez individually, and on behalf of all others similarly situated, hereby file suit against the Defendant listed above and allege the following:

**<u>INTRODUCTION</u>**

1.      This case arises from a massive marketing fraud. Argentine winemaker, Domaine Bousquet (or "Bousquet"), the self-proclaimed "#1 Organic Winery in Argentina," and among the biggest South American exporters of "organic" wine to the United States, is *not* organic. Far from it. Not only does Domaine Bousquet regularly treat its vineyards with herbicides, pesticides, and fungicides that are incompatible with organic viticulture, it uses a substance so toxic that its use is illegal in the United States. How does Bousquet get away with it? Its local third-party certifier, Ecocert Argentina, provides advance notice of its inspections so that Bousquet's employees can hide the banned chemicals before the inspectors arrive. Then, Ecocert Argentina pantomimes the inspection – its inspectors simply driving through the vineyards, usually not stopping and never testing the plants or soil.

2.      This scheme is not just a part of Domaine Bousquet's business in the United States; it defines its business model. Bousquet's entire brand here is represented as organic. A visitor to the winemaker's English-language website will first see in the homepage banner Domaine Bousquet's *trademarked* tagline, "Naturally Organic Wines", directly next to its other slogan in Spanish – "# 1 Bodega **Orgánica & Regenerativa** de Argentina" – "Argentina's #1 Organic Winery."[1] The second dropdown tab from the left is headed, "Organic, Regenerative and Sustainable," and it leads to a page

---

[1] Domaine Bousquet, https://domainebousquet.com/en/ (last visited December 30, 2025).

with nearly 1,000 words of copy trumpeting Bousquet's supposedly organic farming practices. Almost none of it is true. The icing on the cake are the 14 fraudulently procured seals of organic certification – including the U.S. Department of Agriculture's well-known circular organic seal – prominently displayed at the bottom of the webpage.

3.      But consumers do not need to go visit Domaine Bousquet's website to be bombarded with false claims. All they need to do is pass by a shelf display at one of the dozens of stores in New York City that carry Bousquet's wines to see labeling loudly proclaiming the wine's organic status. The labels state, "made with organic grapes, " "organically grown grapes," "organic," and display the famous green and white circular seal, "USDA Organic."

4.      On top of all of this, Domaine Bousquet – through its alter ego, WISD LLC, doing business as Origins Organic Imports ("Origins Organic") – conducts a parallel marketing campaign for its wine that is arguably even heavier-handed. Under the auspices of Origins Organic, Bousquet claims the importer's "mission is to seek out quality organically grown wines from all corners of the globe and introduce those wines to wine lovers here in the United States." It should come as no surprise, given that Origins Organic is controlled by and indistinguishable from Domaine Bousquet, that the "quality organically grown wine" it most aggressively markets are Domaine Bousquet's wines. Origins Organic's website provides a dropdown tab called, "Organic 101," which features a personalized note from Domaine Bousquet's owners, Labid al Ameri and Anne Bousquet, who attest to their "passion" for "all things organic," and sets out the various rules of organic winemaking – nearly all of which Domaine Bousquet violates. Of particular irony, is this factoid: "Third party certifiers are used to prevent 'greenwashing.' Producers must prove they are doing what they say they are doing. Certifying agencies not only require annual reports, but also conduct regular on-site inspections."

2

5.      Plaintiffs Adelina Pepenella and Alan Fernandez were exposed to Domaine Bousquet's marketing representations and relied on them to be true. For years, they bought Domaine Bousquet wines, thinking they were making a good choice for the environment and for their health. When Pepenella learned that Bousquet had been lying the entire time, she was "disgusted" and "sickened." Because of Domaine Bousquet's deceptive practices, its false advertising, and its outright fraud, Pepenella, Fernandez, and all of the members of the class have been damaged.

## PARTIES

6.      *Plaintiff Adelina Pepenella* is a citizen of New York, residing in Long Island City, who is over the age of 18 years. Ms. Pepenella bought a variety of Domaine Bosquet wines regularly for years, spending over $1,000 on these purchases in aggregate. Ms. Pepenella bought the wines in Manhattan, where she works, in the Bronx, where she used to live, and in Long Island City, where she lives now.

7.      *Plaintiff Alan Fernandez* is a citizen of New York, residing in Forrest Hills, who is over the age of 18 years.  Mr. Fernandez purchased Domaine Bousquet's wines for at least a year. Mr. Fernandez generally bought the wine in or around Forrest Hills, where he lives.

8.      *Defendant Domaine Bousquet* is an Argentine *sociedad anónima*, which is the equivalent of a corporation in the United States. Domaine Bousquet is a vintner and wine producer. Domaine Bousquet is 80% owned by the husband-and-wife partners, Anne Bousquet and Labid al Ameri. The remaining 20% is owned by Anne's brother, Guillaume Bousquet. Domaine Bousquet is headquartered in a large *bodega* at kilometer 7 of Route 89 near the town of Tupungato, Argentina. Tupungato is located in the foothills of the Andes mountains in Mendoza, an Argentine province known for its vineyards.

9.      Domaine Bousquet produces its wines at the bodega (where it also has a tasting

3

room and operates a hotel), and currently farms around 240 hectares of vineyards that it owns or leases in the surrounding area. From 2016 to 2023, it also farmed land included the *Finca* Koch, a rented vineyard, directly across the highway from the bodega that consists of about 72 hectares of malbec, pinot noir, chardonnay, cabernet sauvignon, and viognier vines. In recent years, as Domaine Bousquet's production demands have outstripped the capacity of its owned and rented land, it has resorted to buying grapes – and even bulk wine – from outside the Tupungato region, which it uses to produce wines falsely labeled as of Tupungato origin.

10.    As detailed below, direct evidence and testimony show that Domaine Bousquet does not practice organic viticulture. It routinely applies herbicides, such as Roundup, and pesticides, such as Clap, on its own fields, and it buys grapes from non-organic vineyards. But, were this proof not enough, it is a mathematical impossibility for Bousquet to produce organic wines. In its 2023 sustainability report, Domaine Bousquet claimed to have produced 3.9 million liters of organic wine. But the entire organic productive capacity of Tupungato, from where Domaine Bousquet falsely claims all of its wine originates, is only about 2.65 million liters of wine.

11.    *Defendant Origins Organic* is a Delaware limited liability company, nominally headquartered in Miami Florida, but, on information and belief, actually operated by Ms. Bousquet and Mr. al Ameri out of Domaine Bousquet's headquarters in Tupungato. Origins Organic is a wine importer. According to Origins Organic's website, the company "started out as the U.S. importing arm for Domaine Bousquet," and indeed, until recently, Domaine Bousquet wines were the only wines Origins Organic imported.

12.    On information and belief, Origins Organic is wholly owned by Ms. Bousquet and Mr. al Ameri, and, on information and belief, Domaine Bousquet and Origins Organic are managed as part of a single enterprise without respect for corporate separateness. On information and belief,

4

Ms. Bousquet and Mr. al Ameri created Origins Organic to shelter profits from the Argentine tax authorities. Unlike in an arms-length transaction between a foreign wine producer and a U.S. importer, Ms. Bousquet and Mr. al Ameri cause Domaine Bousquet to "sell" wine to Origins Organic for a small fraction of the market price, allowing nearly all of the U.S. dollar profits from wine sales to stay in the United States.[2] Indeed, Origins Organic's margin on a bottle of Bousquet sold in the United States is over *two-and-a-half* times Domaine Bousquet's margin on that bottle. One effect of this arrangement is to separate the profits of Domaine Bousquet's operations from its primary liabilities. Origins Organic also heavily markets Domaine Bousquet's wines in the United States, promoting them on its website and offering "sales tools" for distributors.

13.    *Non-party Ecocert Argentina*, formerly known as Argencert, is an Argentine *sociedad anónima*, headquartered in Buenos Aires. Ecocert Argentina is a third-party certifier and is closely affiliated with Ecocert SAS, a French third-party certifier. In official records, the U.S. Department of Agriculture refers to Ecocert Argentina as Ecocert SAS's "Argentine certification office," and as its "satellite office in Argentina."[3] Ecocert Argentina conducts inspections of agricultural facilities and products to determine whether processes and products are "organic" pursuant to certain internationally recognized criteria. On information and belief, the bulk of Ecocert Argentina's business is with Argentine winemakers serving the export market.

14.    Ecocert Argentina provides advance notice to Domaine Bousquet of inspections, which Bousquet's employees use to hide the banned chemicals they routinely apply in the

---

[2] Taxes on business profits are substantially higher in the Argentina than in the United States, and until very recently Argentina had strict capital controls restricting the outflow of U.S. dollars once they enter the Argentine financial system

[3] USDA Certificate of Accreditation | Ecocert SAS, Mar. 14, 2024, available at www.ams.usda.gov/sites/default/files/media/NOP%20ECO.pdf.

vineyards. When the inspections occur, they are in name only. Domaine Bousquet's employees simply drive Ecocert Argentina's personnel through the vineyard in a truck, affording neither the opportunity to sample the plants nor the soil.

### JURISDICTION AND VENUE

15.     This Court has jurisdiction for this case pursuant to 28 U.S.C. § 1332(d)(2)(C) because it is a class action for damages that exceed $5,000,000, exclusive of interest and costs, in which at least one member of the class is a citizen of New York and at least one of the defendants is a citizen of Argentina.

16.     This Court has personal jurisdiction over Domaine Bousquet because: (1) Plaintiffs bought Domaine Bousquet's wine in the State of New York after seeing Domaine Bousquet's false advertising in the State of New York; and (2) Domaine Bousquet directs such false advertising to the State of New York by shipping thousands of bottles of falsely-labeled wine to the State of New York through its alter ego Origins Organic, providing distributors with marketing materials to display at "tastings" in stores in the State of New York, and maintaining an English language, interactive, website accessible in the State of New York. Moreover, Domaine Bousquet has continuous and systematic business contacts with the State of New York, including by virtue of the facts that its wines are sold in over 100 locations in New York, that it derives substantial revenue from sales of its wine in New York, and that it has knowledge that its wine is being marketed and sold for use in this State. Indeed, since 2007, more than 55% of Domaine Bousquet's exports to the United States (estimated at between 25 and 39 million bottles) went to the New York area.

17.     This Court has personal jurisdiction over Origins Organic because it is the alter ego of Domaine Bousquet and, in the alternative, because it directs false advertising to the State of

New York by shipping millions of bottles of falsely-labeled wine to the State of New York and maintaining an English language, interactive website accessible in the State of New York. Moreover, Origins Organic has continuous and systematic business contacts with the State of New York, including by virtue of the facts that it sells Domaine Bousquet's wines to a New York distributor, who sells the wine to hundreds of stores, bars, and restaurants in New York, that it derives substantial revenue from sales of Domaine Bousquet wine in New York, and that it has knowledge that Domaine Bousquet's wine is being marketed and sold for use in this State.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district.

**FACTUAL ALLEGATIONS**

**A.    Organic Wine Industry and Applicable Labeling Regulations**

19.    "Organic wine" first emerged as a marketing category in the 1970s in Europe and the United States. Although all wines were in a sense "organic" before the development of chemical fertilizers (and later pesticides and herbicides), winemakers have long relied on chemical interventions to enhance yield and manipulate taste. Since the nineteenth century, vintners have used chemical fertilizers in their vineyards and winemakers have added sulfur dioxide – or sulfites – to their wine.[4] Later, vintners followed the rest of the agricultural sector in the widespread use of pesticides and herbicides, and winemakers introduced new additives to affect the taste and body of their wines.

20.    Eventually, there was a backlash. Riding general popular enthusiasm in Western

---

[4] Sulfites are added principally to prevent spoilage and to stop fermentation so as to standardize taste across bottles.

Europe and North America for "natural" or "health" food, and in-step with rising environmental awareness, winemakers in Germany, France, Italy and the United States began experimenting with less chemically invasive winemaking techniques. For some of them, this approach meant a reduction in the amount or number of additives; others abandoned the use of chemicals entirely.

21. Such mixed practices initially led to confusion and disagreement in the wine industry about which wines could be properly considered "organic." The fact that some winemakers began calling their wines by other, similar terms, such as "biodynamic" and "natural," added to the uncertainty.

22. The response was a gradual movement toward standardization and certification. Among governments, France led the way in 1985 with the introduction of the organic certification *Agriculture Biologique* ("AB") and corresponding seal, which is administered by a government agency dedicated to the promotion of organic farming.

23. The United States was slower to add the force of law to its organic labeling standards. For decades, organic certification was an exclusively private matter handled by trade organizations, such as California Certified Organic Farms. That changed in 1990 when Congress passed the Organic Foods Production Act (the "OFPA"), which required the U.S. Department of Agriculture (the "USDA") to establish a National Organic Program (the "NOP"), as well as the National Organic Standards Board to advise on agricultural and production standards. The NOP rules were finalized in the early 2000s.

24. In line with the OFPA, the NOP settled on a decentralized system of certification. Any non-exempt operation that produces agricultural products that are intended to be labeled, "organic" or "made with organic . . ." must comply with myriad production and handling

8

standards,[5] and have such compliance certified by a third-party, private entity, called an "accredited certifying agent" – known in the industry as an "ACA." In other words, the USDA does not itself certify organic agricultural operations.

25.　　ACAs are accredited by the NOP Administrator for five-year periods[6] if the ACA can demonstrate "expertise in the organic production and handling techniques" and meet many other more specific requirements, including that the ACA "[p]revent conflicts of interest by . . . [n]ot permitting any employee, inspector, contractor, or other personnel to accept payment, gifts, or favors of any kind, other than prescribed fees, form any business inspected."[7] Ecocert SAS is an ACA, and Argentina is among its "Certified Operation Locations."[8]

26.　　Different production and handling standards apply to different agricultural products, but no operation can be certified if its production involves the use of certain "prohibited substances," which include all non-exempt "synthetic substances and ingredients."[9]

27.　　Glyphosate, the active ingredient in the herbicide, Roundup, is a non-exempt

---

[5] *See* 7 C.F.R. § 205.100; *id.* § 205.102

[6] *Id.* § 205.500.

[7] *Id.* § 205.501.

[8] Organic Integrity Database | Ecocert SAS Certifier Profile, https://organic.ams.usda.gov/integrity/CP/CertifierProfilePage?cid=24&ret=Certifiers/Certifiers LocationsSearchPage&retName=Certifier%2bLocator (last visited December 30, 2025).

[9] 7 C.F.R. § 205.105

synthetic substance.[10] So is the herbicide, paraquat dichloride.[11] So is fipronil,[12] used in Bayer's Latin American market insecticide, "Clap." And so is the fungicide, carbendazim[13] – which is so toxic that its use is banned outright in the United States, regardless of whether the agricultural operation claims to be organic.[14] In Argentina, carbendazim is allowed for use on a limited number of crops. Fine wine grapes are not among them. Fipronil was banned outright in Argentina in 2023.

28.     The certification process is as follows. The agricultural operation wishing to label its products "organic" must submit an application that contains an "organic production and handling system plan" and other information to an ACA for certification.[15] The ACA reviews the application, and if it appears likely that the operation is compliant, will schedule an onsite inspection to determine actual compliance.[16] During the inspection, the ACA "must verify" among other things "[t]hat prohibited substances have not been and are not being applied."[17] If the

---

[10] *Cf. id.* § 205.601 (listing synthetic substances approved for use in organic crop production). The toxicity of Roundup to humans is the subject of a multi-district litigation pending in the U.S. District Court for the Northern District of California. *See In re Roundup Prods. Liability Litig.*, Case No. 16-MD-02741-VC (N.D. Cal.).

[11] *Cf.* 7 C.F.R. § 205.601(listing synthetic substances approved for use in organic crop production).

[12] *Id.*

[13] *Id.*

[14] American Chemical Society | Molecule of the Week Archive: Carbendazim, https://www.acs.org/molecule-of-the-week/archive/c/carbendazim.html (last visited December 30, 2025).

[15] 7 C.F.R. § 205.401.

[16] *Id.* § 205.402.

[17] *Id.* § 205.403.

operation passes inspection, the ACA must issue a "certificate of organic inspection" and create a unique ID number in the NOP's "Organic Integrity Database."[18] Once an operation is certified, to continue certification, the ACA must conduct further onsite inspections "at least once per calendar year."[19] Additionally, an ACA may schedule additional inspections, which may be "announced" or "unannounced."[20] Every year, at least five percent of an ACA's total inspections of certified operations must be "unannounced."[21]

29.    These certification requirements (including with respect to inspection) expressly apply to "[p]roducts produced in a foreign country and exported to the United States."[22]

30.    Domaine Bousquet was certified as an organic operation on February 15, 2019, for crops and the handling of multiple wines and "wine grape."[23]

31.    Although a producer must be certified to label its products "organic" or "made with organic …", certification is not sufficient. Perhaps envisioning that certification could be obtained by corruption, the NOP also conditions such labeling on the operation actual compliance with the applicable production and handling standards.[24] If the operation is certified and in

---

[18] *Id.* § 205.404.

[19] *Id*. § 205.403; *id*. § 205.406.

[20] *Id*. § 205.403.

[21] *Id.*

[22] *Id*. § 205.300.

[23] Organic Integrity Database | Domaine Bousquet S.A., https://organic.ams.usda.gov/integrity/CP/OPP?cid=24&nopid=7881484003&ret=Search&retName=Search (last visited December 30, 2025).

[24] 7 C.F.R. § 205.300.

compliance, and its products are at least 95% organically produced (and 100% free from prohibited substances) then the operation may label its products "organic" and use the USDA seal and the seal or logo of the ACA. Such operations whose products are made from organic products, and otherwise comply with the NOP regulations, may label their products "made with organic . . ." and also may display the USDA seal and the seal or logo of the ACA.

32.    The USDA seal appears as:



33.    Wine labeling is also regulated by the U.S. Alcohol Tobacco Tax and Trade Bureau (the "TTB") pursuant to the Federal Alcohol Administration Act of 1986.[25] The TTB's enforcement regime includes a pre-approval process for labeling, and, under its authority to prevent "deception of the consumer," requires that the use of the term "organic" comply with the NOP

---

[25] Agreement on the Coordination of Organic Labeling and Advertising Between the Alcohol and Tobacco Tax and Trade Bureau, United States Department of Treasury and the Agricultural Marketing Service, United States Department of Agriculture, June 3, 2010, available at https://www.ttb.gov/media/70991/download?inline.

regulations.[26] Thus, unlike labeling for most products labeled "organic," because of the TTB's jurisdiction, organic wine labeling are subject to regulatory pre-approval.

34.      In the case of imported organic wines, the importer must apply for a "certificate of label approval" (a "COLA") from the TTB before the label can be used. The application includes the proposed label (which much disclose alcohol content, health warnings, a sulfite declaration and other information), and a stamped verification from the winemaker's ACA as to the winemaker's compliance with NOP production and handling standards. Since 2012, 376 COLAs for Domaine Bosquet labels were filed with the TTB.[27] Many, if not most, of these COLAs were filed by Origins Organic[28]. Nearly all of the applications were granted with the following note: "[a]pproval based on certification by the Accredited Certifying Agent (ACA) and subject to compliance with the Organic Foods Production Act of 1990 and the National Organic Program Regulations at 7 CFR Part 205, administered by the U.S. Department of Agriculture- Agricultural Marketing Service."

**B.      Domaine Bousquet's Advertising and Trade Practices**

35.      Domaine Bousquet markets its wines United States as "organic." In fact, "organic" is the entirety of its brand strategy.

36.      Across no fewer than eleven product lines (*Bousquet*, *Gran Bousquet*, *Domaine Bousquet Reserve*, *Domaine Bousquet Sparkling*, *Domaine Bouquet Cameleon*, *Domaine Bousquet*

---

[26] *Id.*

[27] Alcohol and Tobacco Tax and Trade Bureau, COLA Registry,
https://ttbonline.gov/colasonline/publicPageBasicCola.do?action=page&pgfcn=nextset.

[28] *See, e.g.*, TTB ID No. 21239001000117,
https://ttbonline.gov/colasonline/viewColaDetails.do?action=publicDisplaySearchBasic&ttbid=21239001000117.

*Finca Lalande*, *Ameri*, *Alavida*, *LO CA* (low calorie)*, Gaia*, and *Virgen*)[29] and more than 50 different wines, Domaine Bousquet makes one central claim: "organic."

37.    This means that on shelves in stores across the state of New York, consumers see displays like the following one photographed in a liquor store on Lenox Avenue in Manhattan:



---

[29] Domaine Bousquet | Our Wines, https://domainebousquet.com/en/our-wines/ (last visited December 30, 2025).



38.    One bottle (of malbec from the entry-level "*Bousquet*" line), loudly proclaims the wine is "MADE WITH ORGANIC GRAPES." The other bottle (of cabernet sauvignon from the "*Virgen*" line) prominently displays the USDA seal in the top right corner of the label.

39.    Should a consumer turn the bottles around, the back labels offer little information *but* boasts about the wine's supposed organic nature:





40.    The back-label of the *Bousquet* bottle states "100% organically grown grapes,"

and features a quotation attributed to Domaine Bousquet co-owner, Anne Bousquet: "By nourishing the land and treating it with respect, the land will give us back its finest fruits."

41.     The back-label of the *Virgen* bottle goes even further. There, Domaine Bousquet claims: "'Virgen' defines our USDA-certified, vegan, organic wines, the purest expression of our pristine, high-desert Tupungato Valley terroir . . .."

42.     These bottles are not exceptions, Domaine Bousquet labels all of its wines for sale in the United States "organic" in one way or another. As seen above, some bottles are labeled "MADE WITH ORGANIC GRAPES." [30] Some bottles are labeled "ORGANICALLY GROWN GRAPES." Some bottles say, "ORGANIC."[31] While other bottles – like the *Virgen* line – simply display the USDA seal. All of Domaine Bousquet's wines include the word "organic" in their name.[32]

43.     Consumers who visit Domaine Bousquet's English-language website are subjected to more organic marketing. As shown below, the first thing they see in the homepage banner is Domaine Bousquet's trademarked tagline, "Naturally Organic Wines," directly next to its other slogan in Spanish – "# 1 Bodega Orgánica & Regenerativa de Argentina" – which means, "Argentina's #1 Organic and Regenerative Winery."



---

[30] *Id.*

[31] *Id.*

[32] *Id.*

44.     Under the dropdown tab headed, "Organic, Regenerative and Sustainable," appears the following graphic:



The text translates to, "25 years of organic agriculture in Gualtallary" – the area in Tupungato where Domaine Bousquet's bodega is located. There then follows nearly 1,000 words of copy trumpeting Bousquet's supposedly organic farming practices, including:

> In 1998, we initiated the planting of our vineyards, and the organic and sustainable path was the natural choice for us. We grasped the essence of the terroir and its inherent nature, **never resorting to synthetic chemical products in our soil management**. Today, we transcend being just a winery; we symbolize the safeguarding of both the fruit and the land. We proudly hold the distinction of being the primary producer and exporter of "certified organic wine" in our nation. Moreover, we passionately champion a sustainable and enduring course within our community. Since day one, we have remained steadfastly committed to the pursuit of quality and to being at the forefront of sustainability in all our endeavors. [33]

45.     On the website's main page appears Domaine Bousquet's self-published 2024 "Impact Report," which was prepared by a consultant from the Terra Institute and "the

---

[33] Domaine Bousquet | Organic, Regenerative and Sustainable, https://domainebousquet.com/en/winery/practicas-organicas/ (last visited December 30, 2025) (emphasis added). A true and correct copy of the entirety of the webpage is attached hereto as Exhibit A.

sustainability team of Domaine Bousquet."[34] The 113-page report contains sections headed, "Domaine Bousquet's sustainability strategy," "Regenerative agriculture," "Climate change," "Water stewardship," "Thriving ecosystems," and "Circularity."

46.    In the opening "Open dialogue with Anne & Labid" – Domaine Bousquet's owners – Labid al Ameri is quoted claiming that because Domaine Bousquet's vines are "formed naturally – not 'varnished' with pesticides – they are more resilient". In the same section, the owner is quoted stating that when "the soil is fed this way [with no tilling on the ground], and we avoid using chemicals, it begins to absorb carbon from the atmosphere. That enriches the soil, strengthens it, and ultimately results in stronger, healthier plants."

47.    Under the subsection headed, "Objectives of our sustainability strategy," the report states, "Practise and promote regenerative agriculture, avoiding tillage and the use of synthetic fertilisers, pesticides, and weed killers, and promoting the natural biodiversity and soil health." Under a subsection, headed "Biodiversity," the report lists "employing just natural and mechanical pest controls" as among Domaine Bousquet's "Initiatives in place." In the report, Domaine Bousquet recognizes that "ant infestations" are a "challenge," but claims that its response is to "[u]se natural bait and mechanical controls to manage ant populations."

48.    Through its alter ego, Origins Organic, Domaine Bousquet conducts a parallel online marketing campaign for its wine that is arguably even heavier-handed. Origins Organic claims its "mission is to seek out quality organically grown wines from all corners of the globe and introduce those wines to wine lovers here in the United States." But of the 41 wines featured on Origins Organic Import's website, 36 of them are Domaine Bousquet products, and Domaine

---

[34] A true and correct copy of the Impact Report is attached hereto as Exhibit B.

Bousquet wines are the only wines displayed on the website's homepage – under the heading, "Our Organic Wines." The homepage also includes a revolving selection of "Press" – apparently self-published, marketing blurbs about Domaine Bousquet wine and Anne Bousquet. All, or nearly all, of the photos and references to the Domaine Bousquet wines on the Origins Organic webpage include the word "organic" or the USDA seal.

49.     If the homepage were not enough by itself to relieve any doubt that Origins Organic's website is simply another marketing arm for Domaine Bousquet, a visit to the "About Us" page of the site would confirm it.



50.     As can be seen above, "About Us" is really all about Domaine Bousquet. And the webpage expressly claims that Domaine Bousquet is a "pioneering producer of . . . 100% organically grown wines."[35]

51.     Origins Organic's website also provides a dropdown tab called, "Organic 101,"

---

[35] Origins Organic | About Us, https://originsorganicimports.com/about-us/ (last visited December 30, 2025). A true and correct copy of the entirety of the webpage is attached hereto as Exhibit C.

which features a personalized note from Mr. al Ameri and Ms. Bousquet, who declare themselves "passionate advocates for all things organic," and tout their connection to Domaine Bousquet.[36]

52.     The page then sets out various factoids which serve as "one-stop-shop designed to provide comprehensive understanding of organic wines." Among the blurbs are, "Third party certifiers are used to prevent 'greenwashing.' Producers must prove they are doing what they say they are doing. Certifying agencies not only require annual reports, but regular on-site inspections."

53.     Given the prominence of Mr. al Ameri and Ms. Bousquet on the webpage, their express connection to Domaine Bousquet, and the fact that nearly all of the rest of Origins Organic's webpage is devoted to marketing Domaine Bousquet's wines, the obvious implication of this statement, and the other ones about organic wines on the webpage, is that they apply to Domaine Bousquet's wines.

54.     Origins Organics' website also includes a page for "Certifications," which features a table excerpted below:

---

[36] Origins Organic | Organic 101, https://originsorganicimports.com/organic-university/ (last visited December 30, 2025) (emphasis added). A true and correct copy of the entirety of the webpage is attached hereto as Exhibit C.



Origins Organic claims that all of the Domaine Bosquet wines are "certified" organic by multiple organizations.

## C.    Domaine Bousquet's Production Operations

55.    Domaine Bousquet's marketing claims are lies. Its wines are not made with organically grown grapes. On the contrary, its workers have been photographed applying the now-banned, ant-killing pesticide, fipronil, to its vineyards directly in front of the bodega. And for years, Domaine Bousquet used fipronil (specifically Clap), the herbicides, Roundup and Paraquat, and the illegal fungicide, carbendazim, on the crops of a vineyard Domaine Bousquet rented across the street. It also has long used Roundup (or an equivalent glyphosate herbicide) on its own lands. In addition, Domaine Bousquet has bought grapes from non-organic vineyards – sometimes trucking them through its lease properties to disguise their origin – to use in its supposedly "organic" wines.

56.    On October 25, 2023, a confidential informant, who is a former employee of the

Domaine Bousquet ("CI-1"), observed two current employees of Domaine Bousquet contractor, Raúl Claudio Berón Gonzalez, known as Berón, and a worker named Oscar, applying the pesticide, fipronil, to Domaine Bousquet's vineyards rented by Domaine Bousquet, less than two kilometers from its bodega at kilometer 7 of Route 89 near the town of Tupungato. CI-1, Oscar, and Berón know each other well because the three of them worked together for multiple years. CI-1 approached Oscar and Berón and took the following pictures with the camera of CI-1's Galaxy A03 Core smartphone:





57.     CI-1 was not surprised to see Oscar (wearing the black cap) and Berón (wearing the white cap) applying pesticides to Domaine Bousquet's supposedly "organic" vineyard. For years he had done the same for Domaine Bousquet, at its direction, while working at the *Finca* Koch, a vineyard across the highway from Bousquet's bodega that Domaine Bousquet leased from 2016 until 2023.

58.     CI-1 started working at the *Finca* Koch in 1999 when the *finca* was operated by its former owner, Alfredo Koch. Koch practiced organic viticulture, and trained CI-1 and other employees in organic production and handling techniques. In 2016, Koch left Argentina for California and rented the *finca* to his larger neighbor, Domaine Bousquet. The lease contained a covenant requiring Domaine Bousquet to continue to operate the *finca* as a fully organic vineyard.

24

59.    On or around November 1, 2016, Ms. Bousquet arrived at the *finca* and told CI-1 and other former Koch employees that, going forward, they would work for Domaine Bousquet.[37] Almost immediately, CI-1 saw profound changes in operations at the *finca*. Whereas Koch had managed the *finca* himself, Domaine Bousquet's head agronomist, Franco Bastías, and its head of cultivation, Diego Zenteno, brought in a third-party, Franco Bianchetti to run the day-to-operations. In advance of the 2017 harvest – the first one after Domaine Bousquet took over the *finca* – Mr. Bianchetti and Mr. Zenteno (who moved into the house on the *finca*) ordered employees to administer massive amounts of Roundup on wild asparagus – which is an unwanted weed in Tupungato vineyards. This practice would continue throughout the Domaine Bousquet's control of the *finca*, and CI-1 recalls at one point helping to store 20 twenty-liter cans of Roundup. Videos taken of the premises of *finca* Koch in November 2022 and January 2023 show that there were at least six cannisters of Roundup in the *finca*'s tractor garage, as well as a sprayer.

60.    Mr. Zenteno also routinely directed heavy use of the pesticide, Clap – which is the now-banned fipronnil – on ants' nests. Ants are a major problem for vintners in the Tupungato region. A photo below shows an ants' nest on the *finca* Koch in 2023 of the type treated with Clap:

---

[37] In Argentina, it is common for agricultural workers to continue to work on the same land (where they often live), after changes in ownership or operators.



61.     At Mr. Zentero's orders, CI-1 and other Domaine Bousquet employees would don sprayers essentially identical to those worn by Oscar and Berón in the photo above (and possibly those specific sprayers), and administer Clap directly into the mouths of the ants' nests.

62.     Domaine Bousquet used many other synthetic substances that are not exempt under the USDA NOP rules on the fields of *finca* Koch. The herbicide, Paraquat, was used abundantly, and Domaine Bosquet left canisters and a sprayer at the *finca* when it surrendered possession. Below is a photo of such a canister, photographed on May 31, 2023.



63.     A photo of the sprayer, still present months later, was taken on October 18, 2023.



64.    Worst of all, however, Domaine Bousquet apparently used large amounts of the banned fungicide, carbendazim. Because of its extreme toxicity, carbendazim is not approved for use at all in the United States, and not allowed for use on wine grapes in Argentina. Laboratory testing conducted after Domaine Bousquet left *finca* Koch revealed non-trace amounts of

carbendazim in seventy-five percent of the plots tested. In one plot, months after Domaine Bousquet stopped cultivating, the soil still contained 0.65 milligrams of carbendazim per kilogram of soil. Lest there be any doubt that the presence of the chemicals in the soil was attributable to direct application by Domaine Bousquet, tests revealed that soil samples from uncultivated plots of land on *finca* Koch were free from contamination.

65.     Domaine Bousquet's use of chemicals was not limited to the *finca* Koch. In addition to observing first-hand the application of pesticides on Domaine Bousquet's own fields, CI-1 knew that Mr. Bastías, Mr. Zenteno, and Mr. Bianchetti directed the application of herbicides and pesticides on other Domaine Bousquet-operated properties because the shipments of chemicals to *finca* Koch were larger than required for the *finca* alone, and Mr. Zenteno would coordinate their subsequent delivery to other Domaine Bousquet properties. Sometimes, CI-1 helped load trucks with pesticides bound for other Domain Bousquet-operated properties such as *finca* Zampal and *finca* Dutrelli. Domaine Bousquet used *finca* Koch as a chemical depot.

66.     CI-1's story is corroborated by a current employee of Domaine Bousquet ("CI-2"), who works at the Domaine Bousquet bodega. He reported in late 2023 that there was then Clap (fipronil) stored at the bodega, which employees of a contractor (presumably Mr. Bianchetti) were routinely applying to ant's nests. CI-2 reported that Roundup was also used in Domaine Bousquet's fields to kill wild asparagus, and that earlier in the year, Domaine Bousquet had to destroy 23,000 liters of wine that was contaminated with weed killer.

67.     Documents bear out CI-1's and CI-2's testimony. As part of Argentine litigation between the current owner of *finca* Koch and Domaine Bousquet over the Domaine Bousquet's breach of the lease, Domaine Bousquet introduced its own "*cuaderno de campo*" – essentially a farm logbook – for the years 2021, 2022, and 2023, as evidence. There, in clear handwritten print

are entries recording the application of large amounts of "BGO," or "BGOM," or "BGO PS." On information and belief, in Spanish, the agrochemical acronym "BGO" stands for glysphosate – the active ingredient in Roundup.

68. Domaine Bousquet also used *finca* Koch as a depot for non-organic grapes purchased from other Argentine producers. CI-1 witnessed shipments of grapes arrive from the non-organic vineyards to the north of *finca* Koch, like *finca* Chaud and from *finca* Dutrelli, where Domaine Bousquet had harvesting rights. According to CI-2, Domaine Bousquet has been buying grapes "*por todos lados*" – from everywhere. These grapes are not organic. For example, as part of the Argentine lease litigation, Domaine Bosquet produced an invoice from June 27, 2022, for the purchase of 92,800 kilograms of malbec grapes from the producer, Gonzalo Martin Testa. Mr. Testa's operation was not certified as organic when these grapes were cultivated, which would have been in late 2021.

69. On information and belief, Domaine Bousquet has also been purchasing bulk wine from *finca* Montlaize in San Martin, east of the city of Mendoza – which is nearly 100 kilometers outside the Tupungato region from where Domaine Bousquet claims all of its wines originate. CI-1 recalls that Domaine Bousquet would often truck non-organic grapes into *finca* Koch through a back entrance to the property, and truck them out through the front gate enroute to its bodega across the street, in an apparent effort to disguise the origin of the grapes. CI-2 says that once non-organically grown grapes come to Domaine Bousquet's bodega, "*es todo orgánico.*"

70. Indeed, Domaine Bousquet's reliance on non-organically grown grapes is a mathematical certainty. Even counting *finca* Koch and other Domaine Bousquet properties as organic, there are only around 458 hectares of land under cultivation for organic grapes in Tupungato. A hectare in a well-maintained vineyard in Argentina (and *finca* Koch was not well

maintained under Domaine Bousquet's management) can yield about 5,790 liters of wine per year. Thus, the entire annual yield of Tupungato's organic fields is not much more than 2.65 million liters. And yet, in its last sustainability report Domaine Bousquet claimed to have last year produced 3.9 million liters of wine from supposedly organic grapes grown in Tupungato.

71.    Obviously, Domaine Bousquet knows that for an organically-branded winery to use pesticides, herbicides, synthetic fertilizers and banned fungicides is wrong. This is why Domaine Bousquet has taken significant steps to cover up the fraud. While in charge of *finca* Koch, Mr. Zentero and Mr. Bianchetti directed CI-1 and other employees to store chemicals in a loft space in the tractor garage. The photo below show the garage and loft where Domaine Bousquet stored its chemicals.



72.    When an inspection by EcoCert Argentina was scheduled, Mr. Zenteno would direct CI-1 and others to remove the chemicals from the garage entirely and hide them in a brush-filled unplanted section of the *finca*. This area, where Domaine Bosquet also disposed of dead

animals, is shown in the photo below as it appeared in May 2023.



73.    After the EcoCert Argentina inspectors completed their inspection of the *finca* Koch, which consisted of nothing more than driving through the *finca* in a truck, Mr. Zenteno would direct CI-1 and other employees to retrieve the chemicals from the brush and return them to the garage.

74.    The same is true at Domaine Bousquet's bodega, where according to CI-2, Mr. Zenteno would direct the employees to hide all the products that "should not be there."

75.    Mr. al Ameri and Ms. Bousquet and the rest of the Domaine Bousquet's senior management knew or should have known of Domaine Bousquet's widespread use of USDA-

32

prohibited substances in Domaine Bousquet's operations because they frequently toured *finca* Koch while such substances were in use. They also knew or should have known of the non-organic farming because the receipt, application, secretion, and distribution to other Domaine Bousquet properties of chemicals were personally directed by Mr. Zenteno and Mr. Bianchetti, and these men reported directly to Domaine Bousquet's head agronomist, and deputy board member, Mr. Bastías – and later to Mr. Bastías's replacement, Franco Chambard. In addition, Domaine Bousquet's chief operating officer, board member, and chief winemaker, Rodrigo Serrano, frequently visited *finca* Koch while Mr. Zenteno directed the routine application of pesticides, herbicides and fungicides.

**D.    EcoCert Argentina's "Inspections"**

76.    As an ACA, EcoCert Argentina[38] is required under USDA regulations to make at least five percent of its annual inspections "unannounced." It is also required to verify "[t]hat prohibited substances have not been and are not being applied."

77.    During the nearly seven years that that CI-1 worked for Domaine Bousquet, EcoCert Argentina never made an unannounced inspection of Domaine Bousquet's viticulture operations, and never undertook any steps to verify the absence of prohibited substances at *finca* Koch. On the contrary, after CI-1 would receive notice of an impending inspection and help hide the large quantities of chemicals Domaine Bousquet stored at *finca* Koch, he would observe agents of EcoCert Argentina drive through the *finca* in a truck without leaving their vehicle, let alone taking soil or plant samples for testing.

---

[38] As discussed above, EcoCert Argentina is not independently accredited as an ACA with USDA. Rather, its affiliate EcoCert SAS is accredited with EcoCert Argentina variously referred to in government records as EcoCert SAS's "Argentine certification office," and as its "satellite office in Argentina."

E.    **Plaintiffs Experiences**

78.    Plaintiff Alan Fernandez routinely purchased Domaine Bousquet wines from stores in and around Forest Hills, New York, where he lives. He usually bought Domaine Bousquet's red wines.

79.    Prior to his first purchase, Mr. Fernandez read the labeling on Domaine Bousquet's wines, including statements on the labels of certain bottles that the wine inside was "organic" and those of other bottles stating that the wine was "made with organic grapes." He also noted the USDA seal on the labels of bottles of Domaine Bousquet wine. Mr. Fernandez understood these statements and the seal on the labels to mean that the Domaine Bousquet's wines were made from grapes grown without the use of synthetic substances, such as chemical fertilizers, herbicides, pesticides and fungicides.

80.    Mr. Fernandez relied on the above-referenced statements and seal in purchasing Domaine Bousquet's wine. He would not have purchased the wines at all, and certainly would not have paid the price charged, had he known that the wines were not made with organic grapes.

81.    Plaintiff Adelina Pepenella bought a variety of Domaine Bosquet wines regularly for years. She estimates that she spent over $1,000 in aggregate on these purchases. Ms. Pepenella bought the wines in Manhattan, where she works, in the Bronx where she used to live, and in Long Island City where she lives now.

82.    Prior to her first purchase, Ms. Pepenella read the labeling on Domaine Bousquet's wines, including statements on the labels of certain bottles that wine inside was "organic" and those of other bottles stating that the wine was "made with organic grapes." She also noted the USDA seal on the labels of bottles of Domaine Bousquet wine. Ms. Pepenella also navigated to Domaine Bousquet' website and observed the multiple claims described above touting Domaine Bousquet

34

as made from organic grapes. Ms. Pepenella understood these statements and the USDA seal on the labels and displayed on the website to mean that the Domaine Bousquet's wines were made from grapes grown without the use of synthetic substances, such as chemical fertilizers, herbicides, pesticides and fungicides.

83.    Ms. Pepenella relied on the above-referenced statements and seal in purchasing Domaine Bousquet's wine. She would not have purchased the wines at all, and would not have purchased them at the price charged, had she known that the wines were not made with organic grapes. When Ms. Pepenella learned that Domaine Bousquet's had been lying the entire time about whether its wines were organic, she was "disgusted" and "sickened."

## ALTER EGO ALLEGATIONS

84.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 83.

85.    Origins Organic is Domaine Bousquet's alter ego.

86.    Origins Organic was organized, and is operated, by Domaine Bousquet's owners, Labid al Ameri and Anne Bousquet, as mere tool or business conduit of Domaine Bousquet. Origins Organic's sole purpose is to import Domaine Bousquet wine and – through an abusive pricing scheme – park Domaine Bousquet's dollar-denominated U.S. sales revenue off-shore in the United States, where it is safe from Argentine taxes and capital controls. By its own written admission, Origins Organic "started out as the U.S. importing arm for Domaine Bousquet" and to this day, on information and belief, nearly all of the wines imported by Origins Organic are Domaine Bousquet and nearly all of its marketing efforts are in the service of Domaine Bousquet.

87.    Domaine Bousquet dominates and controls Origins Organic to such an extent that no corporate separateness exists. On information and belief, Mr. al Ameri and Ms. Bousquet

directly hold all of the membership interest in Origins Organic. According to the 2024 annual report filed with the Florida Division of Corporations, Ms. Bousquet is the president of Origins Organic. Mr. al Ameri is the managing member. Based on a 2015 filing with the same agency, it appears that Ms. Bousquet is also a manager. Thus, the managers of Origins Organic are also the directors, and 80% equity holders of Domaine Bousquet. On information and belief, these managers impose Domaine Bousquet's policies on Origins Organic.

88.    Since 2022, Origins Organic's registered address with the State of Florida has been 4320 Monserrate Street – a $4.6 million five-bedroom house in Coral Gables, where, on information and belief, Mr. al Ameri and Ms. Bousquet reside while in the United States. On information and belief, Mr. al Ameri and Ms. Bousquet do not observe LLC formalities with respect to Origins Organic.

89.    Origins Organic is a sham entity created by Domaine Bousquet to perpetrate fraud. On information and belief, Domaine Bousquet sells wine to Origins Organic for pennies on the dollar, thereby capturing almost none of the profits from its lucrative U.S. wine exporting operation. Origins Organic, by contrast, sells the imported Domaine Bousquet wine for market value, capturing nearly all of the overall margin on the business. This allows Mr. al Ameri and Ms. Bousquet to keep the vast bulk of Domaine Bousquet's U.S. sales revenue in the United States and avoid Argentine taxes and capital controls. It also separates the operation's assets (largely held by Origins Organic) from its liabilities (born by Domaine Bousquet S.A.) in a way that defrauds creditors such as the most-likely millions of U.S. consumers defrauded by Domaine Bousquet's false advertising.

## CLASS ALLEGATIONS

90.    Plaintiffs re-allege and incorporate by reference herein all of the allegations

contained in paragraphs 1 through 89.

91.     Pursuant to the Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiffs bring this action on behalf of themselves and all residents of New York who purchased Domaine Bousquet wines from 2021 to present (the "Class").

92.     Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

93.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements. Plaintiffs seek to represent an ascertainable class, as determining inclusion in the class can be done through the records of Domaine Bousquet, Origins Organic, and those of the New York distributors and retailers of Domaine Bousquet wines. At a minimum, there are thousands of New York Class members. In the years 2021, 2022, and 2023 alone, Domaine Bousquet shipped over *4 million* bottles of its wine through New York City area ports.

94.     Plaintiffs reserve the right to amend the Class if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

95.     Although the precise number of members of the Class is unknown and can only be determined through appropriate discovery, the proposed Class is so numerous that joinder of all members would be impracticable as Domaine Bousquet has sold millions of bottles of falsely labeled wine in New York during the proposed Class Period.

96.     Questions of law and fact common to the Plaintiff Class exist that predominate over questions affecting only individual members, including *inter alia*:

    a.    Whether Defendants sold wine that was falsely labeled and/or marketed as organic;

    b.    Whether Defendants' wine and winemaking methods were organic;

    c.    Whether Defendants' conduct was intentional, reckless, or negligent;

    d.    Whether Defendants' marketing and/or advertising representations were materially misleading;

    e.    Whether Defendants' marketing and/or advertising misrepresentations caused consumer injury;

    f.    Whether Defendant is liable for statutory and actual damages; and

    g.    Whether Origins Organic is the alter ego of Domaine Bousquet.

97.    Plaintiffs are members of the putative Class. The claims asserted by Plaintiffs in this action are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by the Domaine Bousquet and the relief sought is common.

98.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class, as their interests coincide with, and are not antagonistic to, the other members of the Class. Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation. Putative class counsel has been certified to serve as class counsel by federal courts all over the country on over 80 occasions and has been repeatedly commended by the courts they appear before for the high caliber of their work. *See Barel v. Bank of America*, 255 F.R.D. 393, 398-99 (E.D. Pa. 2009) (finding FMS "competent, experienced and well-qualified to prosecute class actions" and noting that class counsel "have done an excellent job in representing the class in the instant litigation."); *Martinez v. Avantus, LLC,* 343 F.R.D. 254 2023 WL 112807, *9 (D. Conn. Jan. 5, 2023)(firm "has substantial experience in class action litigation….[and] demonstrated proficiency

at all stages of suit"); *Ramirez v. Trans Union, LLC*, 2022 WL 17722395 (N.D. Cal. Dec. 15, 2022)("Courts have consistently recognized Francis Mailman Soumilas 'for…the high caliber of its work for the classes it represents.'"); *Der Hacopian v. SentryLink*, C.A. 18-3001 (D. Md., Nov. 23, 2020)(firm "many, many times in the past has been found to be not just qualified or competent, but extremely well-qualified and competent to represent consumer classes in many, many other jurisdictions, not only this particular jurisdiction"); *Flores v. Express Services, Inc.*, C.A. No.14-3298, 2017 WL 1177098, at *3 (E.D. Pa. March 30, 2017) (firm "has extensive experience in consumer class action litigation); *White v. Equifax Info. Solutions*, No. 05-01070, 2014 WL 1716154, at *13, 19, 22 (C.D. Cal. May 1, 2014), *aff'd sub nom. Radcliffe v. Equifax Info. Sol'ns., Inc.*, 818 F.3d 537, 548 (9th Cir. 2016) (appointing firm and its team as interim class counsel over objections from a competing national law firm (Boies Schiller) because firm's team's "credentials and experience [we]re significantly stronger in class action… litigation."); *Patel v. Trans Union, LLC*, 308 F.R.D. 292, 307 (N.D. Cal. 2015) (FMS "have represented consumer classes in many cases in many districts . . . [and] have shown their proficiency in this case[.]"); *Kelly v. Business Information Group*, C.A. 15-6668, 2019 WL 414915 (E.D. Pa. 2019) (firm "qualified and experienced attorneys" … Francis & Mailman, P.C., of Philadelphia…who have substantial experience in class action….and who are qualified to conduct the litigation."). Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

99.     Certification of the Class is appropriate pursuant to Fed. R. C. P. 23(b)(2) and (b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims, including consistency of adjudications. Absent a class action, it would be highly unlikely

that the members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits would almost certainly exceed the expected recovery.

100.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

101.    The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

## CAUSES OF ACTION
## COUNT I

**VIOLATION OF NY GENERAL BUS. LAW § 349, et seq.**
**(Asserted by Plaintiffs on Behalf of Themselves and on Behalf of the Class Against Defendant Domaine Bousquet (and, in the Alternative Also Against Defendant Origins Organic))**

102.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 101.

103.    N.Y. General Bus. L. § 349, *et seq*. ("GBL § 349") prohibits "deceptive acts or practices in the conduct of any business, trade or commerce in the furnishing of any service in [New York]."

104.    As fully alleged above, throughout the class period, by advertising, marketing, distributing, and/or selling wines labeled and/or described as "organic," "made from organic grapes," or otherwise labeled to imply that the wine is organic, to Plaintiffs and other Class members, Domaine Bousquet engaged in, and continues to engage in, deceptive acts and practices

40

because its wines are not in fact "organic."

105. Additionally, throughout the class period, by failing to disclose that its wines were not "organic" to Plaintiffs and other Class members, Domaine Bousquet engaged in, and continues to engage in, deceptive acts and practices.

106. Plaintiffs seek to enjoin such unlawful, deceptive acts and practices as described above. Each of the Class members will be irreparably harmed unless the unlawful, deceptive actions of Domaine Bousquet are enjoined, in that Domaine Bousquet will continue to falsely and misleadingly advertise that its wines are "organic" and fail to disclose that its wines are not in fact "organic."

107. Domaine Bousquet's marketing and advertising of its wines was consumer-oriented conduct.

108. This consumer-oriented conduct was likely to mislead reasonable consumers acting reasonably under the circumstances.

109. Specifically, false representations and omissions of material facts concerning whether the Domaine Bousquet wine is "organic" were likely to mislead reasonable consumers acting reasonably under the circumstances.

110. Plaintiffs would not have purchased wines from Domaine Bousquet, or would not have paid as much for them, had they known the wines were not "organic."

111. Plaintiffs were injured in fact and lost money as a result of Domaine Bousquet's conduct of falsely describing its wines as "organic." Plaintiffs paid for "organic" wines, but did not receive such products. The products Plaintiffs received were worth less than the products for which they paid.

112. Domaine Bousquet's violations of GBL § 349 were willful and knowing.

113.    Plaintiffs and Class members seek restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, enjoining Domaine Bousquet from continuing to disseminate its false and misleading statements, and other relief allowable under GBL § 349.

114.    In the alternative, if Origins Organic is determined not to be an alter ego of Domaine Bousquet, then each and every allegation against Domaine Bousquet contained in paragraphs 102 through 113 is also alleged as against Origins Organic as a separate entity.

## COUNT II

**VIOLATION OF NY GENERAL BUS. LAW § 350, et seq.**
**(Asserted by Plaintiffs on Behalf of Themselves and on Behalf of the New York Class Against Defendant Domaine Bousquet (and, in the Alternative Also Against Defendant Origins Organic))**

115.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 114.

116.    N.Y. General Bus. L. § 350, *et seq.* ("GBL § 350") makes "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York unlawful.  GBL § 350 provides that "[i]n determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity … to which the advertising relates under the conditions prescription in said advertisement, but also any such conditions as are customary and usual."

117.    Throughout the class period, by advertising, marketing, and/or selling its wines with claims that they were "organic" to Plaintiffs and other Class members, Domaine Bousquet engaged in, and continues to engage in, false advertising concerning the nature of its wines.

118.    Plaintiffs and other Class members seek to enjoin such false advertising as described above.  Each of the Class members will be irreparably harmed unless the unlawful actions of Domaine Bousquet are enjoined, in that Plaintiffs and other Class members will continue to be unable to rely on Domaine Bousquet's representations regarding the nature of its wines.

119.    Domaine Bousquet's marketing and advertising of its wines was consumer-oriented conduct relating to advertising.

120.    This consumer-oriented advertising was likely to mislead reasonable consumers acting reasonably under the circumstances.

121.    Specifically, false representations and omissions of material facts concerning whether the Domaine Bousquet wine is "organic" were likely to mislead reasonable consumers acting reasonably under the circumstances.

122.    Plaintiffs would not have purchased wines from Domaine Bousquet, or would not have paid as much for them, had they known the wines were not "organic."

123.    Plaintiffs were injured in fact and lost money as a result of Domaine Bousquet's conduct of falsely describing its wines as "organic." Plaintiffs paid for "organic" wines, but did not receive such products. The products Plaintiffs received were worth less than the products for which they paid.

124.    Domaine Bousquet's violations of GBL § 350 were willful and knowing

125.    Plaintiffs and Class members seek restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, enjoining Domaine Bousquet from continuing to disseminate its false and misleading statements, and other relief allowable under GBL § 350.

126.    In the alternative, if Origins Organic is determined not to be an alter ego of Domaine

43

Bousquet, then each and every allegation contained in paragraphs 115 through 125 is also alleged as against Origins Organic.

## COUNT III

### QUASI-CONTRACT (UNJUST ENRICHMENT)
**(Asserted by Plaintiffs Against Defendant Domaine Bousquet (and, in the Alternative Also Against Defendant and Origins Organic)**

127.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 126.

128.    Plaintiffs purchased Domaine Bousquet wine as a direct result of Domaine Bousquet's misrepresentations about its farming practices and winemaking processes.

129.    Domaine Bousquet generated profits from its misconduct.

130.    Domaine Bousquet has knowingly and unjustly enriched itself at the expense and to the detriment of Plaintiffs by collecting money to which it is not entitled.

131.    It would be morally wrong to permit the Domaine Bousquet to enrich itself at the expense of Plaintiffs.  Domaine Bousquet should be required to disgorge this unjust enrichment.

132.    In the alternative, if Origins Organic is determined not to be an alter ego of Domaine Bousquet, then each and every allegation contained in paragraphs 127 through 131 is alleged as against Origins Organic.

## COUNT IV

### FRAUDULENT MISREPRESENTATION
**(Asserted by Plaintiffs Against Defendants Domaine Bousquet (and, in the Alternative Also Against Defendant and Origins Organic)**

133.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 132.

134.    Domaine Bousquet made representations about Domaine Bousquet wines that were materially false and that Domaine Bousquet knew were materially false.  These statements include,

44

*inter alia*, that its wines were produced with organic grapes and through the use of organic practices. Domaine Bousquet made these representations in its advertising.

135.    Domaine Bousquet's statements were made to induce Plaintiffs to rely on them, which Plaintiffs justifiably did.

136.    As a result of Domaine Bousquet's fraud, Plaintiffs were induced to purchase Domaine Bousquet's wines, or paid more than they would have, and thereby suffered injury.

137.    In the alternative, if Origins Organic is determined not to be an alter ego of Domaine Bousquet, then each and every allegation contained in paragraphs 133 through 136 is alleged as against Origins Organic.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request judgment against Defendants for themselves and the members of the class as follows:

A.    Certification of the requested Class pursuant to Fed. R. Civ. P 23(b)(2) or (b)(3);

B.    Judgement that Origins Organic is the alter ego of Domaine Bousquet;

C.    Restitution of all charges paid by Plaintiffs and the Class;

D.    Disgorgement to Plaintiff and the Class of all monies wrongfully obtained and retained by Defendants;

E.    Compensatory and actual damages in an amount according to proof at trial;

F.    Statutory damages, penalties, as provided by law;

G.    Prejudgment interest commencing on the date of payment of the charges and continuing through the date of entry of judgment in this action;

H.    Costs and fees incurred in connection with this action, including attorney's fees, expert witness fees, and other costs as provided by law, including GBL § 349 and

GBL § 349.

I.   Punitive damages;

J.   Equitable relief;

K.   Injunctive relief; and

L.   Granting such other relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs hereby request a jury trial for all issues so triable of right

Dated: December 31, 2025

Respectfully submitted,

Peter Fox (PF7117)
**SCOOLIDGE, PETERS, RUSSOTTI & FOX, LLP**
2 Park Avenue, 20th Floor
New York, NY 10016
Telephone:  (212) 729-7708
E-Mail: *pfox@sprfllp.com*


James A. Francis*
Lauren K.W. Brennan*
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Telephone: 215-735-8600
Fax: 215-940-8000
Email: jfrancis@consumerlawfirm.com
Email: jsoumilas@consumerlawfirm.com


*Petition to appear *pro hac
vice* forthcoming


*Attorneys for Plainitffs*